# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DAVID CORDOVA,

        Applicant,

v.                                         CV 09-0821 MV/WPL

JAMES JANECKA, Warden,
and GARY KING,
Attorney General for the
State of New Mexico,

        Respondents.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

David Cordova was convicted of residential burglary and larceny over $2500, both third degree felonies. He was sentenced to six years in prison, enhanced by eight years pursuant to the state habitual offender statute. (Doc. 9 Ex. A at 2-3.)[1] After unsuccessfully pursuing a direct appeal and state habeas relief, Cordova filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.)

### FACTUAL[2] AND PROCEDURAL BACKGROUND

Cordova's convictions arise out of an incident on February 24, 2007. The State alleged that Cordova broke into the home of his nephew, Angel Ruiz, and stole various items including numerous pieces of electronic equipment. (*See* Record Proper (RP) at 1.) At trial, Ruiz testified that the missing items included an Xbox video game console, controls and accessories, and a 220

---

[1] Unless otherwise noted, all exhibits are to Doc. 9.

[2] Unless otherwise noted, the following account of trial testimony is taken from the CD audio recording of the August 13, 2007 proceeding.

capacity canvas portfolio with at least 100 video games, a PlayStation 2 game console, additional controls and accessories, two DVD players,[3] a Motorola cell phone, and a change separator containing approximately $40 in change.  Ruiz also testified that two bags—a large suitcase and an army duffel bag—were later recovered from a well house on his property.  The bags contained various items including clothing, mens shoes, food, and music CDs.  In response to questioning about the contents of the bags, Ruiz stated that a pair of boots and a meth pipe not belonging to him were found in the bags.  Defense counsel objected and the trial judge instructed the jury to ignore any reference to a pipe.

With regard to the value of the items found in the well house, the following exchange took place:

Q:    Did you give a guesstimate as to the value of, the total value of the stuff in the bags, I mean, did you even think about it at the time?

A:    No I didn't, but I also had another CD case in there, the same as was stolen of the games that I kept.  In this one I kept music, and with the music, it was probably about, I'd say about fifteen hundred dollars of stuff was recovered.

Q:    Okay, is that just in the music or total?

A:    Well I couldn't put an estimate on the clothes and stuff, I don't know, but up around the music, it would bring it to a thousand dollars with the music.

After establishing that the music was contained in a canvas portfolio similar to the one containing the video games, the prosecutor asked, "Was that container full?"

A:    The music was full.

---

[3] Later testimony suggests that one DVD player and one DVD recorder were taken.

Q:      And that's why you estimate the cost at about a thousand dollars?

A:      Yes.

Q:      And those music CDs, were those recovered?

A:      Yes, the music was.

With regard to the value of items that were not recovered, Ruiz testified that he had prepared

a list of missing items for Farmer's Insurance, which he provided to the sheriff's department in April

2007.  The trial court admitted the Farmer's Insurance worksheet into evidence.  (*See* State's Ex.

16.)  In addition to the items previously mentioned, the insurance form listed an Atari game console,

a Sony Vaio laptop computer, a Kodak easyshare digital camera, an antique dueling pistol, a Sony

Handycam, and a Panasonic surround sound system receiver.  Information regarding the make,

model, age, and approximate value is provided on the worksheet.[4]  On direct examination, the

prosecution only asked specifically about the video games.  The following exchange took place:

Q:      How did you determine the games, in particular?

A:      Most of them I still have the boxes for, and some were from memory.

Q:      And how many games do you have listed there?

A:      I think it's about a hundred.

Q:      And the form requires a value . . .

A:      Yes.

Q:      . . . how is it that you determined what value to put on that form?

A:      The insurance wanted the value of the games, what it would cost to buy them

        today, so when I bought them, they were fifty dollars, now they're worth

_____

[4] No value is given for the Atari game console, which is listed as twenty-five years old.

3

> twenty dollars, so I searched the internet of the games and that's where I got
>
> the value, on the internet.

Q:    Did you check to see whether those same values are values, or costs, say at

       Walmart, locally?

A:    Yes.

Q:    So did you feel that that was a fairly accurate amount for the games?

A:    I feel it was.

The prosecutor then asked about the total amount of the items on the worksheet.

Q:    Did you ever figure out what the total loss for those items were that you had

       listed there?

A:    Of everything, together?

Q:    Yes, or is there a total there on that sheet?

A:    There isn't a total.  I remember about five thousand dollars, I think.

Q:    And that included the games and the other items that were mentioned on

       there?

A:    Yes.

Q:    Does that list include the items that were recovered from the well house?

A:    No.

Q:    So this is just, then, the items that were never recovered?

A:    Yes.

On cross-examination Ruiz confirmed that the value he gave for the items found in the well

house was a guesstimate, that he never made a list of those items or took photos of them, that he was

"just guessing" at their value, and that he could not say with any certainty the total value of those

4

items.  Defense counsel also asked Ruiz specifically about some of the items listed on the insurance worksheet.  Ruiz indicated that the prices on the worksheet came off the internet, from websites such as Best Buy, Circuit City, and Walmart.  In response to questioning about whether the value he provided for the Sony Handycam was the new value, Ruiz admitted that the Sony Handycam was used and explained, "The insurance company instructed me to list the value of what it would cost me today to buy it."  Defense counsel clarified, "Buy it new?" to which Ruiz responded that "they didn't specify" but he had listed it as new.  Ruiz also admitted that he listed new values for the Panasonic DVD recorder, the Samsung DVD player, the Xbox, the Kodak digital camera, the Panasonic surround sound receiver, the Motorola cell phone, and the PlayStation 2 and that he did not know their used values.  Ruiz claimed that the Panasonic DVD recorder was "out of the box but never used."  He provided the purchase price for the Sony laptop because he still had the receipt.

In addition to Ruiz's live testimony, the prosecution offered into evidence a conversation between Ruiz and Cordova shortly after the burglary, which Ruiz had recorded.  (*See* State's Ex. 18.)  During the conversation Cordova repeatedly admits that he took things from Ruiz's home but claims that he does not know where they are.  He explains that he left a bag of things, including the Xbox and cell phone, by the fence, but when he went back it was no longer there.  In addition, the following exchange took place:

> Cordova:     I know I'm supposed to give you some money for that [inaudible].
>
> Ruiz:          You think you're gonna give me five thousand dollars for that?
>
> Cordova:     Five thousand?
>
> Ruiz:          Yeah.  Those games are fifty dollars apiece that you stole; there's about eighty games in that thing.  The Xbox itself's three hundred.

The trial court also admitted into evidence a recording that Ruiz made of two voice messages

that Cordova left on his phone following the burglary.  (*See* State's Ex. 18.)  Cordova states "the Xbox and the DVD, I threw them over the fence right there in front of that one shed in the front by the road, you should look up there."  He also apologizes and states that he hopes Ruiz finds his things.  Finally, he says "I know it wasn't right for me to take your stuff or to get in your house but you should have locked, shut your front door."

Later, Ralph Cordova, David Cordova's older brother and Ruiz's uncle, testified.  Ralph Cordova testified that he did repair work for his nephew and had a camping trailer hooked up to a truck that he left on the property, which is where he stayed when he stayed over night.  He recounted that he had been at Ruiz's home on February 24, 2007 working on the pump house and when he returned on February 25, 2007 he noticed that the window of his truck was broken.  Defense counsel objected on relevance grounds.  The trial judge allowed the prosecution to proceed "to some degree, but, not too far along that line, if it leads to evidence that's not relevant."  Ralph Cordova continued, testifying that he kept tools and horse supplies in the truck and money for emergencies in the glove box.  He said that the truck was locked so he "figured somebody got in it . . . stuff was moved, papers were scattered around."  Defense again objected and the trial judge asked the prosecutor to move on.

The State also called Officers Valencia and Villanueva and Detective Tavizon.  The officers testified that neither had done an independent investigation regarding the values of the items Ruiz claimed had been taken.  Officer Valencia indicated that he normally does not investigate the values provided by the victim.  Detective Tavizon testified that the value of the merchandise was based on amounts given by Ruiz and that he normally does not attempt to independently determine the value of any items.

Finally, Cordova took the stand in his own defense.  He did not deny that he had taken items

from Ruiz's home.  Rather he claimed that Ruiz had asked Cordova to help him collect an insurance

claim by going into his home and making it look like a burglary.  Cordova stated that he "felt it was

a good opportunity" because "it would be quick money" and "a way of getting me off the streets,

or out of the streets into something that I could pay rent with because I figured it would be a couple

of hundred dollars."  Cordova admitted that he left a bag by the property line because he did not

know if Ruiz would "pay [him] the money right away" or if he "was gonna have to wait until [Ruiz]

got the insurance money," so "I figured I would take his Xbox and sell that so I could get me some

kind of money, a quick forty, fifty, hundred dollars."  Cordova claimed that he did not take the

Handycam video recorder, Sony laptop computer, Kodak digital camera, antique replica dueling

pistol, or Panasonic surround sound system receiver.

On cross-examination, the prosecution asked Cordova whether he had been convicted of

burglary before.  Defense objected and requested a bench conference.  There is no record of any

ruling on this objection.  After the bench conference, the prosecution continued to ask Cordova

about prior felony convictions in Arizona and New Mexico, including a burglary plea in Grant

County.  When the prosecution asked about a plea in Arizona, defense counsel objected again, on

relevance grounds.  The trial judge indicated that he would overrule the objection for impeachment

purposes, stating that if the prosecutor had the documents to impeach she could proceed, to which

defense counsel responded that Cordova had already acknowledged that he had pled to something

in Arizona so it did not constitute impeachment.  The trial judge overruled the objection.  The

prosecutor continued questioning Cordova regarding the plea in Arizona.  The defense again

objected on relevance grounds and suggested that the question had been asked and answered.  After

another bench conference, the prosecution asked Cordova how many felonies he pleaded to in

Arizona.  She then stated, "So, you want us to believe today that you had some misgivings about this

7

scheme, that you claim you were involved in with Mr. Ruiz?" and when Cordova indicated that he

had asked friends for advice about what would happen if he got caught, she asked,"Didn't you

already know what result could happen?"  Finally, when Cordova was unable to give details

regarding the alleged insurance fraud he admitted that maybe he should have gotten more details

about it, and the prosecutor commented, "you should have if you were contemplating and planning

to commit some crimes, insurance fraud, and all that stuff."  The trial judge warned the prosecutor

not to argue with the witness.

　　　　During closing arguments, the defense made several points regarding the value of the items

provided by Ruiz, noted inconsistencies in his testimony, and emphasized that the jury should not

guess at value and that the State bore the burden of proving beyond a reasonable doubt the market

value of the items taken.  Defense counsel stated that

> the jury instruction reiterates that the burden is on the prosecution and, consequently
> it's on law enforcement to bring the proof here today, to court, to you.  They are
> supposed to prove to you the values of these things. They've been on the case since
> February, if they haven't done it by now, you don't have to guess at it, you're not
> supposed to guess at it.

On rebuttal the prosecution noted that

> the officers testified that when they are given information by a victim that they have
> suffered a loss, that they don't go and independently check and see the value of these
> items.  More than one officer told you that they don't do that.  That is something that
> the victim determines what their loss is.

　　　　The jury convicted Cordova of residential burglary and larceny over $2500.  (RP at 94, 95.)

On October 22, 2007, the trial judge sentenced Cordova to fourteen years in prison. (Ex. A. at 2-3.)

　　　　In the docketing statement filed with his appeal, Cordova's trial counsel alleged cumulative

error based on prosecutorial misconduct, challenged the trial court's denial of a directed verdict on

the larceny charge, and noted that Cordova was alleging ineffective assistance of counsel. (*See* Ex.

8

C at 5-7.)  First, counsel complained that the prosecution solicited prejudicial evidence of a meth pipe and prejudicial testimony that a vehicle on Ruiz's property had been broken into around the same time as his house.  Although defense counsel's objections were sustained, counsel argued that the jury would naturally conclude that Cordova was responsible even though not charged for this conduct.  Trial counsel also complained that, when cross-examining Cordova regarding Ruiz's alleged insurance fraud scheme, the prosecution improperly questioned Cordova about a prior burglary conviction, implying that Cordova would not have planned and staged such a sloppy crime given his prior experience.  Finally, trial counsel claimed that the prosecution's comment in closing—that officers did not have to establish the value of the missing items—tended to shift the jury's perception of the State's burden of proof on value.  Counsel alleged that the cumulative effect of this misconduct required a mistrial.

Second, counsel argued that there was insufficient evidence that the total value of the items taken exceeded $2500.  Counsel challenged the trial court's denial of Cordova's motion for a directed verdict on the basis that the market value of the items taken had not been established. Finally, counsel noted that Cordova was alleging ineffective assistance of counsel and had filed a *pro se* motion to substitute counsel.

In a proposed summary disposition, the New Mexico Court of Appeals (NMCA) found that any alleged errors in the prosecution's solicitation of evidence, questions regarding prior convictions and comments on the burden of proof were cured by the trial judge sustaining defense counsel's objections and properly admonishing and instructing the jury.  (Ex. D at 2.)  Moreover, the NMCA found that the cumulative effect of the alleged prosecutorial errors was not so egregious to have a persuasive and prejudicial effect on the jury's verdict or to deprive Cordova of a fair trial.  (*Id.* at 4.)  Regarding sufficiency of the evidence, the NMCA noted that the victim testified as to the

9

approximate value of the items taken and Cordova failed to offer any evidence that the values were inaccurate or that the total fell below $2500. (*Id.* at 5.) Finally, the NMCA determined that Cordova's general assertions of ineffective assistance were not supported by evidence in the record and Cordova had failed to show how any alleged errors prejudiced him or would have changed the result. (*Id.* at 6-7.)

In opposing the proposed summary disposition, Cordova's appellate counsel repeated the arguments regarding insufficient evidence for the value of the property. (*See* Ex. E. at 7-8.) Appellate counsel also argued that the trial court improperly admitted prior bad act evidence. (*Id.* at 3.) Counsel claimed that evidence of the uncharged bad acts—the meth pipe and the broken truck window—was not probative of any conduct relating to burglary or larceny. (*Id.* at 4.) Counsel also suggested that, because Cordova was charged with burglary, the trial court should not have allowed the jury to hear evidence of prior burglary convictions because it could lead the jury to believe that "if Cordova had committed burglary before, he must have done it again." (*Id.* at 5.) Finally, appellate counsel elaborated on the ineffective assistance of counsel claim, arguing that trial counsel was ineffective for failing to investigate Ruiz's insurance claim, failing to call two witnesses who would have testified regarding Ruiz's attempted insurance fraud, and failing to investigate a possible conflict of interest based on the prosecutor's relation to Ralph Cordova by marriage. (*See id.* at 9.) Appellate counsel recognized that the ineffective assistance claim had not been developed at trial and requested remand for an evidentiary hearing to prefect the claim on appeal. (*Id.* at 10.)

The NMCA issued a memorandum opinion affirming the convictions for substantially the same reasons provided in its proposed summary disposition. (*See* Ex. F.) With regard to the improper admission of evidence, the NMCA indicated that it could not determine the relevance of the challenged evidence and Cordova had not provided the basis for the objection, the State's

response, or the trial court's ruling.  The NMCA concluded that, given substantial evidence to support the convictions, any alleged error in admitting this evidence was harmless.  (*Id.* at 3.)  The court declined to remand for an evidentiary hearing on Cordova's ineffective assistance of counsel claim, indicating that such claims ordinarily are heard on a petition for a writ of habeas corpus, and Cordova, therefore, must pursue the issue in a collateral proceeding.  (*Id.* at 5.)  The New Mexico Supreme Court denied Cordova's petition for a writ of certiorari.  (Ex. H.)

The record reflects that Cordova then filed a *pro se* petition for a writ of habeas corpus with the New Mexico Supreme Court.  (*See* Exs. J, K.)  The supreme court remanded the petition to the state district court in accordance with New Mexico Rule 5-802(G).[5]  Cordova raised claims for prosecutorial misconduct and ineffective assistance of counsel.  The district court summarily dismissed certain claims it characterized as prosecutorial misconduct, conflict of interest by the prosecution, and failure to disclose exculpatory evidence.  (Ex. L at 1.)  With regard to the ineffective assistance claim, the court noted that Cordova's "bald allegation of his counsel's failure to investigate [was] not supported by specific instances of ineffectiveness" but the court scheduled an evidentiary hearing to give Cordova an opportunity to present evidence on this claim and appointed counsel to represent Cordova at the hearing.  (*Id.* at 1-2.)  Cordova's habeas counsel filed a supplemental petition, discussing the legal standards applicable to a claim for ineffective assistance and concluding that trial counsel made "critical errors and omissions of constitutional proportion during the trial that were not related to any reasonable trial strategy."  (Ex. M at 4-5.)

After the evidentiary hearing, the district court entered an order denying Cordova's ineffective assistance claim.  (Ex. N.)  The court noted that Cordova's case was unusual because,

---

[5] According to Rule 5-802(G), the district court must treat a petition remanded by the supreme court as if it had been originally filed in the district court.  *See* NMRA 5-802(G).

at trial, he had admitted to insurance fraud but not to burglary or larceny.  (*Id.* at ¶ 3.)  The court found that Cordova had not given his trial attorney the names of potential witnesses and that his attorney had subpoenaed and interviewed the State's witnesses prior to trial and had weighed the benefit and detriment of Cordova's proposed defense and determined that it was not a viable defense.  (*Id.* at ¶¶ 5-6.)  The court also found that Cordova's claims that his attorney had failed to discuss the case with him were not credible.  (*Id.* at ¶ 8.)  Moreover, the court found that, even if Cordova's proposed witnesses were usable at trial and trial counsel had hired an investigator to pursue Cordova's claims of insurance fraud, the charges against Cordova might have been more numerous with credible proof of conspiracy and insurance fraud.  (*Id.* at ¶ 9.)  Cordova filed a petition for a writ of certiorari, which the New Mexico Supreme Court denied.  (Exs. O, P.)

Cordova raises three claims in his federal habeas petition.  First, he asserts that the admission of prior bad act evidence and prosecutorial misconduct prejudiced his trial.  (Doc. 1 at 6.)  Second, he argues that the evidence was insufficient to find that the value of the property exceeded $2500.  (*Id.* at 7.)  Finally, he claims that he received ineffective assistance of counsel.  (*Id.* at 9.)

In their Answer, Respondents concede that Cordova has exhausted state remedies as to the claims raised in his federal petition.  Respondents argue that Cordova's petition should be denied on the merits because he has not met the requirements of 28 U.S.C. § 2254(d) and because any error in the state court criminal proceeding was harmless.  (Doc. 9 at 5, 8.)

### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act (AEDPA) modified the role that federal habeas courts play in reviewing state convictions.  *Bell v. Cone*, 535 U.S. 685, 693 (2002). Congress enacted AEDPA to prevent federal habeas "retrials" and to ensure that state convictions are given effect to the fullest extent possible.  *See id.*  Thus, when a state court has adjudicated a petitioner's

claims on the merits, the petitioner is entitled to federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" *id.* § 2254(d)(2). The federal law must be clearly established by the Supreme Court at the time of the state court judgment. *Id.* § 2254(d)(1); *see also Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006). A state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009) (internal citations omitted). A state court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (internal citations omitted).

Under section 2254(d)(2), a decision is based on an unreasonable determination of the facts if it is shown by clear and convincing evidence that the factual finding is erroneous. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *see also* 28 U.S.C.A. § 2254(e)(1) (requiring federal habeas court to presume that state court's determination of factual issues is correct unless the petitioner rebuts the presumption by clear and convincing evidence).

These standards of review apply only to claims that were "adjudicated on the merits in State court." 28 U.S.C.A. § 2254(d); *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004). The pre-AEDPA standard of review applies to claims that were not adjudicated on the merits in state court. *Gipson*, 376 F.3d at 1196; *Hooks v. Ward*, 184 F.3d 1206, 1223 (10th Cir. 1999). Pure questions of law and mixed questions of law and fact are reviewed *de novo*. *Hooks*, 184 F.3d at 1223; *see also*

2 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE §

30.2a (3d ed. 1998).  But if a state court has made factual determinations that are relevant to these

questions, those factual determinations must still be presumed correct.  *See Hooks*, 184 F.3d at 1223;

*see also* 28 U.S.C.A. § 2254(e)(1).

### CLAIM ONE: IMPROPER ADMISSION OF EVIDENCE & PROSECUTORIAL MISCONDUCT

In his federal petition, Cordova lists as ground one "prior bad act evidence and prosecutorial

misconduct prejudiced Mr. Cordova's trial."  (Doc. 1 at 6.)  He then cites to New Mexico Rule of

Evidence 11-404(B) governing the admissibility of evidence of "other crimes, wrongs, or acts."

NMRA 11-404(B).  In light of the arguments made on direct appeal, it appears that Cordova is, in

part, challenging the trial court's evidentiary rulings regarding evidence of uncharged acts—the

meth pipe and broken truck window—and evidence of his prior burglary convictions.   In his

docketing statement, Cordova's trial counsel discussed the solicitation of bad act evidence in the

context of prosecutorial misconduct and did not challenge the trial court's evidentiary rulings.

Cordova's appellate counsel first raised an issue regarding the admission of this evidence in

opposition to the NMCA's proposed summary affirmance, arguing that the trial court improperly

admitted evidence of uncharged acts and prior burglary convictions.  In its memorandum opinion,

the NMCA addressed these arguments as to the meth pipe and truck window, but not as to the prior

burglary convictions.  Because, the NMCA did not address the merits of Cordova's challenge to the

admission of his prior burglary convictions, I review this claim *de novo*.  *See Hooks*, 184 F.3d at

1223.  I review the NMCA's decision regarding evidence of uncharged acts under AEDPA's

deferential standard.

Generally, federal habeas corpus relief does not lie to review state law questions about the

admissibility of evidence.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Federal courts may

14

not interfere with state evidentiary rulings unless the rulings in question rendered "the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." *Gilson v. Sirmons*, 520 F.3d 1196, 1242 (10th Cir. 2008) (internal quotations omitted).  Stated another way, a federal court "will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (internal citations omitted).

The trial court overruled the defense's objections and allowed the prosecution to question Cordova regarding prior felony convictions, including a plea to burglary in Grant County and a felony conviction in Arizona.  On appeal, appellate counsel argued that "the mention of the prior burglary must have led the jury to believe that if Mr. Cordova had committed burglary before, he must have done it again."  (Ex. E at 5.)  The evidence supporting the burglary charge included Cordova's tape recorded admissions as well as his own trial testimony admitting to the burglary but attempting to defend his actions by stating that they were part of a scheme to defraud Ruiz's insurance company.  In light of this overwhelming evidence, the admission of evidence of Cordova's prior felony convictions did not render the trial fundamentally unfair or constitute a denial of due process.

Nor did evidence of uncharged acts.  Although the trial court did allow the prosecution to question Ralph Cordova regarding his broken truck window, given the evidence to support the conviction, this did not amount to a denial of due process.  Moreover, the trial judge did sustain defense counsel's objections to evidence of a meth pipe and specifically admonished the jury to ignore any reference to a pipe.  The NMCA found that any error was cured by the trial court sustaining defense counsel's objections and properly admonishing or instructing the jury.  The

15

NMCA also concluded that any error was harmless, "given the substantial evidence to support the crimes for which Defendant was charged and convicted." (Ex. F at 3.) Again, in light of the overwhelming evidence at trial, reference to these uncharged acts cannot be said to have rendered the trial so fundamentally unfair as to deny Cordova's constitutional rights. Accordingly, the NMCA's decision did not constitute an unreasonable application of federal law.

Claim one also alleges prosecutorial misconduct. Although Cordova does not provide details in his federal petition, his arguments on appeal suggest that this claim relates to the prosecutor's solicitation of testimony regarding the meth pipe and broken truck window, the prosecutor's questioning regarding prior burglary convictions, and the prosecutor's comments during closing argument that the officers did not have to establish the value of the missing items. (*See* Ex. C at 5-7.) The NMCA found that any alleged error was cured by the trial court sustaining defense counsel's objections and admonishing the jury. Moreover, because there was no assertion that the prosecutor attempted to solicit improper evidence after the trial judge sustained each objection, the NMCA concluded that there was no prosecutorial misconduct. (Ex. F at 3.) With regard to the prosecutor's closing argument, the NMCA noted that evidence of value was introduced and the jury was specifically instructed that it was the State's burden to prove the value of the items taken.[6] (Ex. D at 3.)

Prosecutorial misconduct may serve as the basis for habeas relief only if the prosecutor's

---

[6] This aspect of the NMCA's ruling appears in the proposed disposition but not the final memorandum opinion. I am unaware of any circuit precedent explaining how to determine whether a claim has been adjudicated on the merits under New Mexico's unique calendaring system when the proposed disposition differs from the final memorandum opinion. However, because the NMCA considered Cordova's opposition and affirmed nonetheless, and because my recommendation would be the same on *de novo* review, I consider the NMCA's treatment of this issue in the proposed disposition a decision on the merits and apply AEDPA's deferential standard.

conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[7]   *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).   To determine whether a prosecutor's actions rise to this level, a federal court must consider "the totality of the circumstances, evaluating the prosecutor's conduct in the context of the whole trial."   *Cummings v. Evans*, 161 F.3d 610, 618 (10th Cir. 1998); *accord Donnelly*, 416 U.S. at 642-48.   As the Tenth Circuit has explained:

> To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution.   We also ascertain whether curative instructions by the trial judge, if given, might have mitigated the effect on the jury of the improper statements.   When a prosecutor responds to an attack made by defense counsel, we evaluate that response in light of the defense argument.   Ultimately, we must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly.

*Cummings*, 161 F.3d at 618 (internal quotations omitted).

The prosecution's actions do not appear to constitute prosecutorial misconduct.   Cordova does not assert, and there is no evidence in the record, that the prosecution attempted to elicit further testimony regarding the meth pipe and broken truck window after the trial court had sustained the objections.   Also, the trial judge overruled the defense's objections to evidence of prior felony convictions and allowed the prosecution to question Cordova on this subject.   In closing, the prosecution noted that the officers had testified that they do not independently check the value of stolen items and that the victim determines the value of the loss.   The prosecution made this comment in rebuttal, after defense counsel had suggested that the burden was on not only the

---

[7] If prosecutorial misconduct deprives the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was rendered fundamentally unfair.   *See Mahorney v. Wallman*, 917 F.2d 469, 472 (10th Cir.1990) (citing *Donnelly*, 416 U.S. at 643).   Cordova, however, has not made any allegations that the State's conduct affected any specific constitutional rights.

17

government, but on law enforcement as well, to prove value.  The prosecutor's remark was not only an accurate statement of the law, it was invited by defense counsel's closing argument.  *Cf. Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (explaining that, although the idea of invited response does not excuse improper comments, it is relevant to determine their effect on the trial as a whole).  Moreover, the court specifically instructed the jury that it was the State's burden to prove value.  In short, the prosecution's actions do not appear to have been improper, but if they were, when considered in the context of the trial as a whole—including the trial court's evidentiary rulings, curative instructions, and defense counsel's closing remarks—they did not render the trial fundamentally unfair.  Accordingly, the NMCA's determination was not an unreasonable application of federal law.

### CLAIM TWO: SUFFICIENCY OF THE EVIDENCE

In his second claim, Cordova argues that there was insufficient evidence to find that the value of the property exceeded $2500 and consequently that the State did not meet its burden of proof.  On appeal, Cordova claimed that the trial court erred in denying his motion for a directed verdict on the larceny charge on the basis of insufficient evidence of market value.  Cordova argued that the "[v]alues of items were primarily guessed at, or were in used condition and new prices were given." (Ex. C at 7.)  He also noted discrepant testimony regarding the number of DVDs missing.[8] (*Id.*)  In its proposed summary disposition, the NMCA indicated that "[t]he question presented by a directed verdict is whether there was substantial evidence to support the charge." (Ex. D at 4-5.)  The court then stated,

The victim testified as to the approximate value of the items taken and a worksheet

---

[8] Although the appeal documents refer to missing DVDs, the testimony at trial related to missing video games.

he had prepared for his insurance company with these values was entered into evidence.  [DS 5]  Defendant asserts that some of the values were for the items as new, rather than their market value, as the jury instruction provides.  *See* UJI 14-160 [sic] NMRA.

(*Id.* at 5.)  The NMCA proposed to conclude that there was sufficient evidence as to the value of the items taken, noting,

> To the extent Defendant argues that some of the values were inaccurate, he failed to tender evidence establishing what the correct values were, or that they affected the total value of the items, such that it fell below $2,500.  Similarly, Defendant presented no evidence to show that the discrepancy concerning the exact number of DVDs affected the total value of the items.  There is a presumption of correctness in the rulings or decisions of the trial court, and Defendant has the burden on appeal to show such error.

(*Id.* (internal citations omitted).)  In its memorandum opinion and order, the NMCA reiterated that Cordova had "failed to tender evidence establishing what the correct values were, or that they affected the total value of the items, such that it fell below $2,500."  (Ex. F at 4.)

I do not consider the NMCA's decision an adjudication on the merits of this claim.  Because Cordova's appeal was decided on the NMCA's summary calendar, the court of appeals did not review the trial transcript.  *See* NMRA 12-210(D)(1) (providing that a transcript of proceedings shall not be filed if case is placed on summary calendar).  Although the NMCA referred to certain testimony regarding value, this was precisely the testimony that Cordova was challenging as insufficient.  The NMCA simply copied these facts, out of context, from Cordova's docketing statement without reviewing the trial record.  (*See* Ex. D at 4-5 citing to "DS.")  In this situation, the NMCA's disposal of the claim on an incomplete factual record does not constitute an adjudication on the merits and is not entitled to deference under AEDPA.[9]  *See Wilson v. Workman*, 577 F.3d

---

[9] Even if the NMCA's decision is considered an adjudication of the merits, it would not be entitled to deference because it constituted an unreasonable application of federal law.  *See Parsad v. Greiner*, 337 F.3d 175, 182 (2d Cir. 2003) (noting that the Appellate Division's unreasonable decision was not entitled to

1284, 1291 (10th Cir. 2009) (holding that "when the state court makes such findings on an

incomplete record, it has not made an adjudication on the merits to which we owe any deference");

*see also Torres v. Lytle*, 461 F.3d 1303, 1312 (10th Cir.2006) ("Although ordinarily we would

review Mr. Torres's habeas claim on that same record and give the state court's ruling the usual

AEDPA deference, we are now considering the trial transcript, which was not presented to the [state

court]. Accordingly, we may not be deciding the same legal issue decided by the [state court], at

least if the trial transcript provides substantial evidence not in Mr. Torres's pleadings with the [state

court].").

  Under Supreme Court precedent, sufficient evidence exists to support a conviction if, "after

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

---

deference under 28 U.S.C. § 2254(d)(2)).  The NMCA cited New Mexico case law holding that "the question presented by a directed verdict motion is whether there was substantial evidence to support the charge." (Ex. D at 5 citing *State v. Dominguez*, 853 P.2d 147, 157 (N.M. Ct. App. 1993)).  Although the NMCA failed to cite any federal basis for this claim, it is considered a decision on the merits "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).  The substantial evidence standard employed by *Dominguez* is consistent with *Jackson*.  *See State v. Chavez*, 211 P.3d 891, 895 (N.M. 2009) (discussing the substantial evidence standard for reviewing the sufficiency of the evidence and noting that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (citing *Jackson*, 443 U.S. at 319).  Thus, it could be said that the court of appeals was applying the *Jackson* standard.  However, the NMCA appears to have impermissibly shifted the burden of establishing market value to Cordova.

  Referencing Cordova's docketing statement, the NMCA noted that "the victim testified as to the approximate value of the items taken and a worksheet he had prepared for his insurance company with these values was entered into evidence." (Ex. D at 5.)  The NMCA then stated, "To the extent Defendant argues that some of the values were inaccurate, he failed to tender evidence establishing what the correct values were, or that they affected the total value of the items, such that it fell below $2500." (*Id.*)  As discussed below the burden was on the State to prove market value.  Cordova asserted that the testimony referenced by the NMCA established new, not market, value and therefore the State had failed to meet its burden. Requiring Cordova to provide evidence of market value would impermissibly shift the burden of proof on this element to the defendant.  Accordingly, the NMCA's application of the *Jackson* standard was unreasonable and its decision is not entitled to deference.  *See Parsad*, 337 F.3d at 182; *see also Stevens v. Ortiz*, 465 F.3d 1229, 1240 (10th Cir. 2006) (holding that AEDPA deference did not apply to state court determination contradicting Supreme Court precedent); *Sanders v. Cotton*, 398 F.3d 572, 584 (7th Cir. 2005) (stating that state court's finding was an unreasonable determination of the facts not warranting any deference).

have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id.*  Accordingly, review of a state court sufficiency of the evidence determination is "sharply limited and a court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Brown v. Sirmons*, 515 F.3d 1072, 1089 (10th Cir. 2008) (internal quotations omitted). "The court may not weigh conflicting evidence or consider the credibility of witnesses, but must accept the jury's resolution of the evidence as long as it is within the bounds of reason."  *Valdez v. Bravo*, 373 F.3d 1093, 1097 (10th Cir. 2004) (internal citations omitted).

Whether the evidence is sufficient depends on what the State is required to prove.  *See Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007) (citing *Jackson*, 443 U.S. at 324 n.16).  In New Mexico, to establish third degree larceny the State must prove that the value of the items taken exceeded $2500, the statutory minimum that defines the level of the offense.  *See State v. Landlee*, 513 P.2d 186, 187 (N.M. Ct. App. 1973) (finding evidence of value sufficient to sustain conviction of larceny over $100 but less than $2500); *State v. Williams*, 493 P.2d 962, 962 (N.M. Ct. App. 1972) (same); *State v. Phillips*, 487 P.2d 915, 918 (N.M. Ct. App. 1971) (noting that "an element to be proved was that the value of the stolen property was over $100 but less than $2500.00"); *cf. State v. Alvarez-Lopez*, 98 P.3d 699, 720 (N.M. 2004) (Serna, J. dissenting) (stating that, "[i]n order to prove the larcenies, the State had the burden to show beyond a reasonable doubt that Defendant carried away property with a market value of over $250"); *see also* NM UJI 14-1601 (providing, "For you to find the defendant guilty of larceny . . . , the state must prove to your satisfaction beyond

21

a reasonable doubt each of the following elements of the crime: 1. The defendant took and carried away _____(describe property), belonging to another, which had a market value over $ _____ . . .").

The value to be proven is the market value.  *State v. Gallegos*, 312 P.2d 1067, 1068 (N.M. 1957) (noting that "market value when stolen [is] the yard stick in making [the value] determination").  Market value is "the price or prices at which the property could ordinarily be bought and sold, by or between persons who would ordinarily buy and sell goods for cash or trade at an equivalent for cash."  *Id.* at 1067; *see also* NM UJI 14-1602 (defining market value as "the price at which the property could ordinarily be bought or sold at the time of the (criminal act)").  Evidence of extrinsic or replacement value is not sufficient to establish market value.  *See State v. Gallegos*, 312 P.2d 1067, 1068 (N.M. 1957).  Nor is evidence of purchase price, if not accompanied by additional information such as age, condition, and utility of the property.  *See, e.g.*, *S.A.S. v. Florida*, 970 So.2d 483, 483 (Fla. Dist. Ct. App. 2007); *Pate v. Georgia*, 280 S.E.2d 414, 415 (Ga. Ct. App. 1981); *Illinois v. Langston*, 420 N.E.2d 1090, 1094 (Ill. App. Ct. 1981); *State v. Thibeault*, 390 A.2d 1095, 1102 (Me. 1978); *New York v. Gonzales*, 633 N.Y.S.2d 482, 485 (N.Y. App. Div. 1995); *Dunn v. Commonwealth*, 284 S.E.2d 792, 792 (Va. 1981) (per curiam); *Utah v. Lyman*, 966 P.2d 278, 283 (Utah Ct. App. 1998) (cases finding purchase price to be insufficient evidence of market value where evidence was not presented as to age, condition, or utility); *cf. State v. Barr*, 984 P.2d 185, 193 (N.M. Ct. App. 1999) (finding victim's testimony of the purchase price of consumer goods, coupled with information about the age and condition of the goods, sufficient to allow the jury to draw reasonable inferences about the present market value of the items).  *But see, e.g.*, *People v. Paris*, 511 P.2d 893, 894 (Colo. 1973) (en banc) ("Evidence of the purchase price of the goods, however, is competent evidence of fair market value only where the goods are so new, and thus, have depreciated in value so insubstantially as to allow a reasonable inference that the purchase

price is comparable to the fair market value."); *State v. Gartner*, 638 N.W.2d 849, 860 (Neb. 2002) (same). This is particularly important in the case of electronic equipment, which tends to depreciate rapidly. *See, e.g.*, *Foreman v. United States*, No. 07-CF-1130, 2010 WL 374111, at *2 (D.C. 2010) (noting that electronic products tend to depreciate rapidly as technology changes and old versions are replaced); *State v. Browne*, 854 A.2d 13, 36 (Conn. App. Ct. 2004) (noting that electronic equipment is subject to prompt depreciation and purchase price is insufficient to establish value). As the NMCA has explained,

> Market value denotes not the value of the goods in the market in which the owner had purchased them or in which he could replace them, but the value in the market in which the goods were being traded, namely, the price at which they would probably have been sold in the regular course of business at the time when and place where they were stolen.

*State v. Richardson*, 546 P.2d 878, 879 (N.M. Ct. App. 1976) (quoting *People v. Irrizari*, 156 N.E.2d 69, 71 (N.Y 1959)).

It is well settled that an owner may testify regarding the market value of property and such testimony is sufficient to support a jury's determination of value. *See State v. Zarafonetis*, 472 P.2d 388, 391 (N.M. Ct. App. 1970); *see also State v. Hughes*, 767 P.2d 382, 385 (N.M. Ct. App. 1988). This is because an owner "necessarily knows something about the quality, cost, and condition of his or her property and consequently knows approximately what it is worth." *Hughes*, 767 P.2d at 385; *see also Menici v. Orton Crane & Shovel Co.*, 189 N.E. 839, 841 (Mass. 1934) ("The rule which permits the owner of real or personal property to testify as to its value does not rest upon the fact that he holds the legal title. The mere holding of the title to property by one who knows nothing about it and perhaps has never even seen it does not rationally and logically give him any qualification to express an opinion as to its value. Ordinarily an owner of property is actually familiar with its characteristics, has some acquaintance with its uses actual and potential and has had

experience in dealing with it.  It is this familiarity, knowledge and experience, not the holding of the title, which quality him to testify as to its value.")  Accordingly, a non-owner must demonstrate sufficient knowledge before testifying to market value.  *See Whitley v. State*, 13 P.2d 423, 423 (N.M. 1932) ("Unless the property in question is of such a nature that only expert testimony is competent, non-experts with requisite knowledge may testify as to its market value . . . .").  Similarly, an owner may not guess at the property's value.  *See, e.g.*, *Woolford v. State*, 58 S.W.3d 87, 90 (Mo. Ct. App. 2001) (finding evidence insufficient where owner guessed at a fair approximation of value); *Toler v. State*, 779 So. 2d 594, 595 (Fla. Dist. Ct. App. 2001) (finding evidence insufficient where victim gave rough estimate of property value); *Hughes v. State*, 625 S.W.2d 547, 550 (Ark. Ct. App. 1981) (finding evidence of value insufficient where witness offered a guess and admitted she could be mistaken); *King v. State*, 243 So.2d 766, 768 (Ala. Cr. App. 1971) (finding evidence insufficient and noting that "[t]he witness' 'opinion' was nothing more than his guess" and that "[s]uch testimony ought not to suffice in a criminal case to establish an essential element of the case against the defendant"); *cf. Reeves v. Crawford*, 364 S.E.2d 895, 895 (Ga. Ct. App. 1988) (affirming directed verdict where owner admitted on cross-examination that his opinion was mostly guesswork); *see also* 37 A.L.R.2d 967 (discussing admissibility of evidence and noting that owners must be familiar with property and demonstrate actual knowledge of value).

The jury's determination of value must be based on reasonable inferences from the evidence and cannot be the result of speculation or conjecture.  "While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable." *Torres*, 461 F.3d at 1313 (internal quotations omitted).  "A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such an inference is infirm because it is not based on the evidence." *Id.*; *see*

*also State v. Contreras*, 915 P.2d 306, 309 (N.M. Ct. App. 1996) (finding nothing in the record to support a jury inference of market value over $250); *State v. Seward*, 724 P.2d 756, 758 (N.M. Ct. App. 1986) (finding insufficient evidence to support conviction of larceny over $2500 where testimony of $4000 included both the value of the items taken and the amount of damages); *see also State v. Haar*, 797 P.2d 306, 309 (N.M. Ct. App. 1990) (finding that specific values provided by owner in criminal damage case did not require speculation or conjecture on part of jury).

Although this is a close case, I find sufficient evidence to support the larceny conviction.[10] First, I note the problems with the State's evidence of value, which consisted of Ruiz's testimony and the insurance worksheet. Ruiz admitted that he was "just guessing" at the value of the items found in the well house and that he could not say with any certainty the total value of those items. He also admitted that most of the values he provided on the insurance worksheet were new replacement values. Specifically, Ruiz provided new values for the Sony Handycam, the Panasonic DVD recorder, the Samsung DVD player, the Xbox, the Kodak digital camera, the Panasonic surround sound receiver, the Motorola cell phone, and the PlayStation 2. He had obtained these values off the internet from the websites of such stores as Circuit City, Best Buy, and Walmart. It appears that he also provided new values for the video games, explaining that when he bought them, they were worth $50, but at the time of the burglary they would cost $20 and he determined this by looking the games up on the internet and comparing them to Walmart prices. As the cases cited

---

[10] The trial judge also struggled with the sufficiency of the evidence when he ruled on Cordova's motion for a directed verdict, indicating that he thought the evidence was weak and that "it wouldn't have taken anything more than Mr. Ruiz or even the deputy to say we checked into the value of used DVD's and they're now worth twenty dollars not fifty dollars or they're now worth ten dollars down at the used CD store for music, and they didn't do that . . . ." (Audio recording of 8/13/2007 proceedings.) But the judge determined that the inconsistencies in the record were for the jury to decide. He acknowledged that under new case law he could be reversed.

above demonstrate, neither guesstimates nor replacement value are sufficient to establish market value.

There is very little evidence of age, condition and utility of the property. The insurance worksheet includes information regarding the age of the various items. However, most of these ages are estimates, ranging from less than four years for the Xbox video games, to less than two years for the Sony Handycam and Panasonic DVD recorder to more than three years for the Xbox game console. (*See* State's Ex. 16.) Ruiz testified that the Panasonic DVD recorder was "never used. It was out of the box but never used." There is no evidence regarding the condition or utility of the other items except the implication that, because the music CDs and the video games were kept in canvas portfolios, they were not in their original cases.

There was testimony that the total value of the items taken was approximately $5000 but it cannot be taken as evidence of market value. On direct examination Ruiz stated that, although the insurance worksheet did not include a total, he remembered the total value for everything listed on the insurance worksheet was about $5000.[11] This cannot be considered an estimate of market value as Ruiz admitted that most of the values on the worksheet were new replacement values. In the conversation with Cordova that Ruiz recorded, Ruiz told Cordova that Cordova owed him $5000 because the video games were worth $50 apiece and the Xbox was worth $300. This cannot be considered an estimate of market value. Ruiz had also testified that $50 was the purchase price for the video games and that the replacement value for the Xbox at the time of the larceny was $180, suggesting that $300 was also the original purchase price for the Xbox. No rational trier of fact could have found that this testimony established market value beyond a reasonable doubt. In short,

---

[11] According to my calculations, the worksheet amounts add up to $5653.10.

it is clear that Ruiz was not concerned with the used value of any of the stolen property: in his interactions with Cordova and with the insurance company he measured the value of his property in terms of what it had cost him originally or what it would cost him to replace it new.

Despite numerous problems with the evidence presented by the State, there is sufficient evidence from which the jury could infer that the market value of the items taken exceeded $2500. The evidence shows that the Sony laptop computer was purchased for $1200 and was just six months old.  Given how new it was, a jury could infer that the laptop was still worth close to its original purchase price.  The remaining items needed to have a combined market value of at least $1300.  The remaining items included the Sony Handycam, the Panasonic DVD recorder, the Samsung DVD player, the Kodak easyshare digital camera, the Panasonic surround sound receiver, the Motorola cell phone, the Sony PlayStation 2, the Xbox game console, approximately 100 video games, and approximately 220 music CDs.  A rational trial of fact could have inferred that the market value of these items was at least $1300 and, therefore, that the total market value of the stolen property was at least $2500.  Accordingly, the evidence was sufficient to support the conviction for larceny over $2500.

### CLAIM THREE: INEFFECTIVE ASSISTANCE OF COUNSEL

In his third claim, Cordova alleges ineffective assistance of counsel.  He complains that his trial counsel failed to investigate whether Ruiz filed an insurance claim in someone else's name, failed to call two witnesses who would have testified regarding Ruiz's attempted insurance fraud, and failed to investigate a conflict of interest due to the prosecution's relation by marriage to the State's witness.  The district court found Cordova's conflict of interest allegation procedurally barred as it had not been preserved at trial or on appeal.  (*See* Ex. L.)  The court held an evidentiary hearing on Cordova's remaining allegations of ineffective assistance.  (*Id.*)

27

Cordova was represented by habeas counsel at the hearing.  Both Cordova and his trial attorney, Daniel Dietzel, testified.  Cordova testified that he had told his attorney about two witnesses who would corroborate his story of insurance fraud but he admitted that he never gave his attorney the names of those witnesses.  (*See* Transcript of May 11, 2009 Proceedings at 10, 21, 25-26.)  Dietzel testified that Cordova had mentioned two witnesses but Dietzel had determined that their testimony would be hearsay as they had not witnessed the alleged conversation between Cordova and Ruiz in which they discussed defrauding the insurance company.  (*Id.* at 39.)  Dietzel did not interview them and testified that he did not have information as to their names or how to contact them.  (*Id.* at 40-41.)  Dietzel also testified that Cordova had proposed presenting a defense based on Ruiz's attempt to defraud the insurance company and that Dietzel discussed this strategy and its problems with him.  (*Id.* at 35, 46.)  Finally, Dietzel testified that he had not hired an investigator because he did not think it was warranted.  (*Id.* at 48.)

Although the district court had ruled that Cordova's conflict of interest allegation was procedurally barred, his habeas counsel elicited some testimony on this subject at the hearing. Cordova testified that the prosecutor's niece was married to Ralph Cordova, one of the witnesses for the State.  When the court asked Cordova if he was alleging that she was related to him, Cordova stated, "Well, I don't know.  Through Ralph, yeah, I guess."[12]  (*Id.* at 9.)  Cordova later acknowledged that the prosecutor was not personally related to him.  (*Id.* at 10.)  Dietzel testified that Cordova had shared his concerns regarding a conflict of interest on the part of the prosecution. (*Id.* at 42.)  Dietzel understood that Cordova "felt like [the prosecutor] was being very hard on him because of some personal relationship or some relative-type relationship . . . ."  (*Id.*)  Dietzel had

---

[12] Recall that Ralph Cordova is David Cordova's older brother.

tried to explain that "the relationship he was talking about wasn't a close enough relationship and that it seemed to me that the DA was prosecuting him and he was facing as much time as he was because of his prior criminal history and because of . . . his pending probation violation." (*Id.* at 42-43.)

After the hearing, the district court denied Cordova's ineffective assistance claim, finding that Cordova had not given his trial attorney the names and addresses of his alleged witnesses and that trial counsel had subpoenaed and interviewed the State's witnesses prior to trial.  The district court also found that trial counsel weighed the benefit and detriment of Cordova's proposed defense and determined that it was not viable.  Moreover, the court reasoned that even if trial counsel had hired an investigator to investigate the alleged insurance fraud, "the charges against [Cordova] may have been more numerous had there been credible proof of a conspiracy and insurance fraud." (Ex. N. at ¶ 9.)  The district court did not make any factual findings regarding the conflict of interest allegation.  The court concluded that Cordova had not met his burden under *Strickland v. Washington*, 466 U.S. 668 (1984).

Although the district court found Cordova's allegations regarding a conflict of interest on the part of the prosecution procedurally barred, Respondents have failed to raise this defense. Although procedural default may be invoked *sua sponte*, *Hardiman v. Reynolds*, 971 F.2d 500, 503-05 (10th Cir. 1992), I decline to do so here as it would delay the proceedings and because these claims are easily resolved on the merits.  *See* 28 U.S.C.A. § 2254(b)(2) (providing that a federal habeas court may deny a claim on the merits, notwithstanding the failure to exhaust state remedies); *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000) (declining to address complex procedural bar because case could be more easily and succinctly affirmed on the merits); *see also Tisthammer v. Williams*, 49 F. App'x 757, 764-65 & n.4 (10th Cir. 2002) (addressing the merits of an

unexhausted, procedurally barred claim because it would be necessary to request supplemental briefing if the court invoked the procedural issues *sua sponte* and because the claim could be easily resolved on the merits).  Because the state district court did not adjudicate this claim on the merits I review the allegations of conflict of interest *de novo*.  I review the district court's decision on the remaining allegations of ineffective assistance under AEDPA's deferential standard.

To establish ineffective assistance of counsel, a habeas petitioner must satisfy both parts of the two-part test articulated by the Supreme Court in *Strickland*.  First, he must show that counsel's performance was deficient.  466 U.S. at 687.  This requires a showing "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment."  *Id.* Judicial scrutiny of counsel's performance is highly deferential; thus, he must overcome the presumption that the challenged action might be considered sound trial strategy.  *Id.* at 689.  Second, the petitioner must show that counsel's deficient performance was prejudicial.  *Id.* at 687.  This requires showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*

All of Cordova's ineffective assistance claims should be denied.  With regard to the prosecution's alleged conflict of interest, counsel's performance does not appear to have been deficient.  Trial counsel believed that the prosecutor's relationship, by virtue of her niece's marriage, to the State's witness was not close enough and that the prosecution and length of sentence to which Cordova was exposed were due to his prior criminal history and pending probation violation.  Even if counsel somehow erred by not investigating the conflict of interest, there is no indication that this error prejudiced Cordova.  Cordova has not presented any evidence, or even argued, that, but for the error, the result of the proceeding would have been different.  Accordingly, this claim fails.

Similarly, the district court determined that Cordova had not satisfied the *Strickland* standard with regard to his other allegations of ineffective assistance.  The district court's factual findings are entitled to a presumption of correctness and Cordova has not presented any evidence in rebuttal.  *See* 28 U.S.C. § 2254(e)(1).  The court found that Cordova did not provide trial counsel with the names of his alleged witnesses and that trial counsel weighed the benefits and detriments of Cordova's proposed insurance fraud defense and determined it was not viable.  On these facts, the district court's conclusion that Cordova had not satisfied *Strickland* was not an unreasonable application of federal law.

## CONCLUSION

For the reasons stated herein, I recommend that the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition.  If no objections are filed, no appellate review will be allowed.**

---

William P. Lynch

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE